IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOHN PAUL DeBIASO, JR., personally, and
as next friend for C.D., and RACHAEL ANN          No. 03-12-cv-00967-HZ
CURRIE, personally and as next friend for
C.D.,

                 Plaintiffs,

        v.                                                OPINION & ORDER

KRISTINA SPITZ,

                 Defendant.


Mikel R. Miller
LAW OFFICE OF MIKEL R. MILLER, P.C.
26 N.W. Hawthorne Ave.
Bend, Oregon 97701

        Attorney for Plaintiffs

Ellen F. Rosenblum
ATTORNEY GENERAL
/ / /
/ / /


1 - OPINION & ORDER

Heather J. Van Meter
Dirk L. Pierson
SENIOR ASSISTANT ATTORNEYS GENERAL
Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096

     Attorneys for Defendant

HERNANDEZ, District Judge:

     Plaintiffs John DeBiaso and Rachael Ann Currie bring this action against Defendant Kristina Spitz, alleging that Spitz, in her role as a child protective services worker for the State of Oregon's Department of Human Services (DHS), violated their constitutional rights and those of their child C.D., on whose behalf they appear as "next friend," when Defendant removed C.D. from the family home following Plaintiffs' arrests.

     Defendant moves for summary judgment. I agree with Defendant that she did not violate Plaintiffs' rights in removing C.D. from the home and is absolutely immune from liability for her actions. I also agree that Plaintiffs fail to establish that Defendant provided false statements to the Circuit Court. Therefore, I grant Defendant's motion.

## BACKGROUND

     On June 1, 2010, the Jefferson County Sheriff's Department arrested Plaintiffs on various charges related to the possible manufacture and sale of controlled substances to minors. Exs. 1, 2 to Van Meter Decl. (OJIN Reports). Upon arriving at Plaintiffs' home to execute a search warrant, Sheriff's Deputies found DeBiaso having just smoked medical marijuana while C.D., almost four years old at the time, was in the home napping. DeBiaso Dep. (Ex. 8 to Van Meter Decl.) at 21-22; Def. Dep. (Ex. 7 to Van Meter Decl.) at 15; DeBiaso Decl. at ¶ 1. The police

2 - OPINION & ORDER

also saw a scale on the table, baggies next to the scale, a jar full of marijuana, and a pipe that had

just been smoked.  DeBiaso Dep. (Ex. 8 to Van Meter Decl.) at 21-22.  Currie was not at the

home.  Deft. Dep. (Ex. 7 to Van Meter Decl.) at 14.  DeBiaso was arrested and taken to the

county jail.  Id. at 15.  Currie was arrested later that day.  Ex. 2 to Van Meter Decl.

Because C.D. would have been left home alone upon taking DeBiaso into custody, the

Sheriff's Department contacted DHS.  Def. Dep. (Ex. 7 to Van Meter Decl.) at 13-14.  Defendant

met law enforcement at the home where DeBiaso was in handcuffs and shortly thereafter, was

taken to jail.  Id. at 14-15.  Law enforcement had already searched the home, and according to

Plaintiffs, made quite a mess of things.  DeBiaso Decl. at ¶ 3; Currie Decl. at ¶ 2 (stating that

police trashed her home).

Defendant observed a marijuana grow operation, prescription drugs, and knives

accessible to C.D.  Def. Depo. (Ex. 7 to Van Meter Decl.) at 16-17.  She also observed electrical

wires dangling above the hydroponic marijuana growing system which concerned her.  Id. at 19-

20.  There were also dozens of bongs or water pipes for marijuana use lying about the house.  Id.;

see also Ex. 10 to Van Meter Decl. (photographs of the home taken June 1, 2010 by Sheriff's

Department showing marijuana plants, dried marijuana, water pipes/bongs, vials of prescription

medication, large knife, and several pairs of scissors, out in the open on tables and counters).

Although Plaintiffs contend that the items were not accessible to C.D. until after the police

moved them, there is no dispute that when Defendant arrived at the home, all of these items were

accessible to C.D.  Id. at 17; DeBiaso Decl. at ¶¶ 3, 6, 7; Currie Decl. at ¶ 3.

Defendant contacted her supervisor, Roy Jackson, and reported her observations to him.

Def. Dep. (Ex. 7 to Van Meter Decl.) at 16.  Jackson determined that DHS should take C.D. into

3 - OPINION & ORDER

protective custody.  Id.  Defendant arranged for foster care for C.D. for the night of June 1, 2010,

while Plaintiffs were in jail.  Ex. 3 to Van Meter Decl. (DHS Child Welfare Placement Info.

Form).  Later that day, Defendant spoke to DeBiaso in jail and learned from him that DeBiaso's

brother could care for C.D.  Deft. Dep. (Ex. 7 to Van Meter Decl.) at 37; DeBiaso Decl. at ¶ 4.

On June 2, 2010, a shelter hearing was held in Jefferson County Circuit Court, during

which the Circuit Court took testimony from Defendant and issued an order regarding C.D.'s

custody and care.  Ex. 4 to Van Meter Decl.  At the time of the hearing, both parents remained in

jail, although Currie was released later that day at 4:30 in the afternoon.  Exs. 1, 2 to Van Meter

Decl. at 2; Ex. 4 to Van Meter Decl.; Currie Dep. (Ex. 9 to Van Meter Decl.) at 32.  DeBiaso was

released a week later.  Currie Dep. (Ex. 9 to Van Meter Decl.) at 32.  Both Plaintiffs and C.D.

were represented by counsel at the June 2, 2010 shelter hearing.  Ex. 4 to Van Meter Decl.  The

Shelter Order gave DHS temporary custody of C.D. and authorized DHS to place C.D. with a

relative if deemed appropriate.  Id.  It also ordered that any contact between Plaintiffs and C.D.

be supervised.  Id.  C.D. was placed with DeBiaso's brother the following day, on June 3, 2010.

Def. Dep. (Ex. 7 to Van Meter Decl.) at 37; Exs. 4, 5 to Van Meter Decl.  Another hearing was

set for June 10, 2010.  Ex. 4 to Van Meter Decl.

Upon placement with DeBiaso's brother, C.D. was scheduled for supervised visits with

Plaintiffs on June 8 and 9, 2010.  Ex. 5 to Van Meter Decl.  Plaintiffs complain that they were

prevented from speaking to their relatives during this time and could not call their son.  DeBiaso

Decl. at ¶ 9; Currie Decl. at ¶ 6.  During his supervised visits, DeBiaso states he was instructed

what to say to his son.  DeBiaso Decl. at ¶ 9.

At the June 10, 2010 hearing, the Deputy District Attorney, DHS, and Currie appeared.

4 - OPINION & ORDER

Unnumbered Ex. to Def. Dep. appended to Miller Decl.; Currie Dep. (Ex. 9 to Van Meter Decl.) at 32.  The Circuit Court issued another Shelter Order on that date.  Unnumbered Ex. to Def. Dep. appended to Miller Decl.  The Court found that continued removal of C.D. from the home was in C.D.'s best interests because there was good cause to believe C.D. had been neglected or abused or placed at significant risk of neglect or abuse.  Id.  The Court further found that DHS had made diligent efforts to place C.D. with a suitable relative.  Id.  The Court continued temporary custody of C.D. with DHS.  Id.  The Court allowed the parents to have contact with each other for the purposes of the dependency case.  Id.  The Court ordered that parenting time as to the parents and the child was at DHS's discretion, that the Court was to be notified in writing should DHS decide to return C.D. to Currie's physical care, and that should DHS wish to have both parents in the home, a motion to the Court was required.  Id.  The Court set a further hearing for July 8, 2010.  Id.

C.D. was returned to his parents' custody on June 25, 2010.  Currie Decl. at ¶ 10; Ex. 6 to Van Meter Decl.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

5 - OPINION & ORDER

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted).  The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material.  Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009).  The court draws inferences from the facts in the light most favorable to the nonmoving party.  Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

Plaintiffs bring three claims under 42 U.S.C. § 1983:  (1) Defendant's removal of C.D. from Plaintiffs' care and the continued placement of C.D. away from Plaintiffs violated their constitutional rights to maintain a familial relationship; (2) Defendant's removal of C.D. from Plaintiffs' care when he was not in danger violated C.D.'s Fourth Amendment rights to be free from unreasonable searches and seizures; and (3) Defendant's provision of false information to the Circuit Court, with the expectation that the Court would rely on that false information, violated Plaintiffs' constitutional rights to procedural and substantive due process.

6 - OPINION & ORDER

Defendant moves for summary judgment, contending that the initial removal of C.D. from the home did not violate Plaintiffs' Fourth or Fourteenth Amendment rights and that Defendant is entitled to immunity for her actions.  Defendant also argues that Plaintiffs fail to show that she provided false information to the Circuit Court.

I.  Initial Removal from the Home

In their first two claims, Plaintiffs challenge Defendant's actions in removing C.D. from the home on June 1, 2010.  A claim by parents regarding the unconstitutional removal of children is properly "assessed under the Fourteenth Amendment standard for interference with the right to family association" while a claim by the child who was seized is assessed under the Fourth Amendment.  Wallis v. Spencer, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000).  However, because "the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children," the claims are analyzed together.  Id.

> It is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child and that the state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. § 1983.  This constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents.

Lee v. City of Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001) (citation, internal quotation marks, and brackets omitted), overruled on other grounds by Galbraith v. Cnty. of Santa Clara, 307 F.3d 1119 (9th Cir. 2002); see also Woodrum v. Woodward Cnty., 866 F.2d 1121, 1124 (9th Cir. 1989) ("A parent's interest in the custody and care of his or her children is a constitutionally protected liberty interest, such that due process must be afforded prior to a termination of parental status.").

However, the constitutional right is not absolute.  Mueller v. Auker, 700 F.3d 1180, 1186 (9th Cir. 2012); Woodrum, 866 F.2d at 1125.  "Under certain circumstances, these rights must bow to other countervailing interests and rights, such as the basic independent life and liberty rights of the child and of the State acting as *parens patriae*; and on occasion, this accommodation may occur without a pre-deprivation hearing."  Mueller, 700 F.3d at 1186; see also Woodrum, 866 F.2d at 1125 ("The interest of the parents must be balanced against the interests of the state and, when conflicting, against the interests of the children").  The Fourteenth Amendment, then, "guarantees that parents will not be separated from their children without due process of law except in emergencies."  Mabe v. San Bernadino Cnty. Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1107 (9th Cir. 2001); see also Mueller, 700 F.3d at 1187 ("constitutional rights of parents step aside[] [i]n an emergency situation when the children are subject to immediate or apparent danger or harm") (internal quotation marks and ellipsis omitted).

As explained by Wallis, the general standard for both the Fourteenth Amendment and Fourth Amendment claims is that

> [o]fficials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.

Wallis, 202 F.3d at 1138; see also James v. Rowlands, 606 F.3d 646, 652 n.2 (9th Cir. 2010) (seizure of child violates child's Fourth Amendment rights unless it is authorized by warrant or court order or justified by exigent circumstances).

The undisputed facts are that law enforcement called DHS after executing the search warrant at Plaintiffs' home and upon the arrest of DeBiaso.  It is also undisputed that Currie was

8 - OPINION & ORDER

arrested, or going to be arrested, that afternoon as well.  Plaintiffs do not dispute that when Defendant arrived at the home, the condition of the home was as Defendant describes, and as the photographs show.  While they argue that the Sheriff's Department created the allegedly unsafe conditions, they do not sue the Sheriff's Department in this action.  There is no dispute that C.D. was going to be left alone in the home without intervention.  Further, there is no dispute that both parents were incarcerated overnight and that a custody hearing was held the next day, June 2, 2010.

Oregon statutes state a preference for leaving children in their own homes with their families.  Or. Rev. Stat. §§ (O.R.S.) 419B.090(2)(a)(A), (5).  But, the statutes also provide that a child may be taken into custody when the child's "condition or surroundings reasonably appear to be such as to jeopardize the child's welfare[.]"  O.R.S. 419B.150(1)(a).  The person responsible for taking the child into custody "shall release" the child to the child's parent or other responsible person except where a court has issued an order directing that the child be taken into protective custody or where the person taking the child into custody has probable cause to believe that the welfare of the child may be immediately endangered by the release of the child.  O.R.S. 419B.165.

O.R.S. 419B.185 requires an evidentiary hearing if a child is taken into protective custody.  Preference is given to placement with a relative.  O.R.S. 419B.192.  The child and the parents are entitled to court-appointed counsel.  O.R.S. 419B.195, 419B.205.

Based on the undisputed facts, I reject Plaintiffs' argument that "Spitz . . . should  have known that the potential harm of leaving the child in the home was outweighed by the known damage caused to children by being forcibly removed by law enforcement."  Pl.'s Resp. to Mot.

9 - OPINION & ORDER

at 7.   Even without considering the condition of the home, or who was responsible for that condition, there is no question that leaving C.D. alone in the home was not a viable option.   The circumstances were exigent and required that C.D. be taken into custody immediately.   No reasonable juror could dispute that the circumstances facing Defendant provided reasonable cause to believe C.D. was in danger if not taken into custody.

DeBiaso asserts that he told Defendant that placing C.D. with DeBiaso's brother was an option.   Although DeBiaso does not clearly state the date and time of this conversation in his Declaration, DeBiaso Decl. at ¶ 4 (stating that Defendant contacted him while in jail and he gave her names and phone numbers of family members who could care for C.D., but not providing date or time), Defendant confirms that she spoke to DeBiaso the same day C.D. was taken into custody, but only after he was in jail.   Def.'s Dep. (Ex. 1 to Miller Decl.) at 37; see also id. at 26-27 (first thing Defendant did upon returning to her office with C.D. was try to call DeBiaso at the jail, but Defendant was unable to make contact because DeBiaso was taken to the hospital; noting that she later spoke with him at the jail by phone to obtain relative information). Defendant had no option but to take C.D. into protective custody on June 1, 2010, even if for the limited purpose of determining what other placement options existed.

Moreover, the Circuit Court held a shelter hearing the next day at which both parents and C.D. were represented by separate counsel.   The parents were personally present at the hearing. The Court ordered that DHS retain temporary custody of C.D. and authorized DHS to place C.D. with a relative if deemed appropriate.   As Defendant explained in her deposition, once DHS has custody of a child, any placement it makes must be certified.   Id. at 37-38.   Once DHS obtained the information about DeBiaso's brother, it went to work on certifying family members for C.D.'s

10 - OPINION & ORDER

placement. Id. at 38. Plaintiffs present no facts indicating that placement with DeBiaso's brother did not occur as soon as his home was certified by DHS. Although there is a dispute in the record about whether the family home was suitable for C.D. as of June 3, 2010 and thereafter, Currie's testimony establishes that her home was safe and free from danger no sooner than twenty-four hours after her release from jail, meaning sometime in the afternoon of June 3, 2010. Currie Decl. at ¶ 5. Thus, until that time, the undisputed record establishes that placement away from the parents and the home was the only reasonable option for C.D.'s care.

Based on these facts, Plaintiffs cannot sustain their claim that their constitutional familial relationship rights, or C.D's Fourth Amendment rights, were violated by Defendant's initial actions of taking C.D. into custody on June 1, 2010 and continuing until June 3, 2010. Plaintiffs received all process that was due. Moreover, while a substantive due process violation can also arise in the context of a familial relationship claim where all procedural protections are provided, the governmental intrusion into the relationship must be unwarranted. See, e.g., Crowe v. Cnty. of San Diego, 608 F.3d 406, 441 & n.23 (9th Cir. 2010) ("unwarranted state interference with the relationship between parent and child violates substantive due process"). Here, no reasonable juror could conclude that Defendant's actions were unwarranted.

II.  Absolute Immunity

Defendant argues that she is entitled to absolute immunity for the quasi-prosecutorial actions of seeking and obtaining a court order to take C.D. into protective custody on June 1 and 2, 2010, and is further entitled to absolute immunity for the quasi-judicial actions of carrying out and enforcing the Court's Shelter Order on June 3, 2010 and thereafter.

As to the actions of June 1 and 2, 2010, as an alternative to my conclusion above that

11 - OPINION & ORDER

Plaintiffs cannot survive summary judgment on the portion of their First and Second Claims for Relief targeting Defendant's actions beginning on June 1, 2010 and continuing until sometime on June 3, 2010, I agree with Defendant that she is entitled to absolute immunity.[1]  Actions by a child services worker in exercising independent judgment in determining when to bring custody or dependency proceedings is analogous to the function of a criminal prosecutor.  Coverdell v. Dep't of Soc. & Health Servs., 834 F.2d 758, 763-64 (9th Cir. 1987) ("social workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings") (citing Meyers v. Contra Costa Cnty. Dep't of Soc. Servs., 812 F.2d 1154 (9th Cir. 1987) (addressing the issue of immunity for government employees whose duties include the initiation and pursuit of dependency petitions in cases of suspected child abuse or neglect)).  Thus, for this independent reason, I grant summary judgment to Defendant on the portion of the First and Second Claims for Relief directed to Defendant's actions on June 1, 2010 to June 3, 2010.

Absolute immunity extends to child services workers whose actions are performed pursuant to court order.  Coverdell, 834 F.2d at 764-65.  "[P]ersons who faithfully execute valid court orders are absolutely immune from liability for damages in civil rights actions challenging conduct authorized by the order."  Id. at 764.  Because such persons are "integral parts of the judicial process," they are entitled to absolute quasi-judicial immunity for damages.  Id. at 765 (internal quotation marks omitted) (further stating that "[t]he fearless and unhesitating execution

---

[1]  Plaintiffs' separate claim for relief based on Defendant's allegedly providing false information to the Court as part of her quasi-prosecutorial duties in seeking a court order is discussed below.  As noted there, Defendant is not entitled to absolute immunity for such a claim.

of court orders is essential if the court's authority and ability to function are to remain uncompromised").

More recent cases explain, however, that absolute immunity in civil rights actions under section 1983 protects "only those who perform a function that enjoyed absolute immunity at common law." Miller v. Gammie, 335 F.3d 889, 897 (9th Cir. 2003) (to enjoy "absolute immunity for a particular action, the official must be performing a duty functionally comparable to one for which officials were rendered immune at common law"). "Officials performing the duties of advocate or judge may enjoy absolute immunity for some functions traditionally performed at common law, but that protection does not extend to many of their other functions." Id.

Defendant argues that because her actions in placing C.D. with DeBiaso's brother on June 3, 2010 were performed pursuant to the Court's June 2, 2010 Shelter Order in which the Court continued DHS custody and ordered placement of C.D. with a relative, her actions are absolutely immune under the doctrine of quasi-judicial immunity. Plaintiffs do not respond to the absolute immunity argument. Instead, they raise issues of fact regarding certain aspects of Defendant's conduct beginning on June 3, 2010 and continuing until C.D. was returned to the family home in late June 2010. First, they contend that the Court's order regarding placement with a relative allowed Defendant discretion regarding that placement and that Defendant could have returned C.D. to the family home as early as June 3, 2010 when Currie was out of jail and had cleaned up the home. Second, they contend that during the time that C.D. was in relative placement, there was no basis to forbid Plaintiffs from calling C.D. at DeBiaso's brother's home, to forbid Plaintiffs from calling DeBiaso's brother, and to restrict the supervised visits between Plaintiffs

13 - OPINION & ORDER

and C.D. to only one hour per week.

The June 2, 2010 Shelter Order under which Defendant acted from June 3, 2010 until June 10, 2010 did not allow Defendant to place C.D. back in the home. Instead, it ordered DHS to place C.D. with a relative if appropriate. Execution of this directive is the functional equivalent of the actions of the Court itself and thus, Defendant is entitled to absolute quasi-judicial immunity for placement of C.D. with DeBiaso's brother on June 3, 2010 through June 10, 2010. See Engebretson v. Mahoney, No. 10–35626, 2013 WL 2350341, at *4 (9th Cir. May 30, 2013) (under functional approach analysis, court concluded that "prison officials charged with executing facially valid court orders enjoy absolute immunity from § 1983 liability for conduct prescribed by those orders" because "such immunity is grounded in the common law") (citing, inter alia, Miller, 335 F.3d at 895–96 (recognizing the "common-law tradition that extended absolute immunity to individuals performing functions necessary to the judicial process")); Rogan v. Washington, No. 08–0794RAJ, 2009 WL 1393214, at *2 (W.D. Wash. May 18, 2009) (under functional approach, "[s]ocial workers are entitled to absolute immunity from suits based on [] the performance of quasi-judicial . . . duties, such as the execution of a court order").

The Circuit Court's Shelter Order also directed that any contact between C.D. and his parents was to be supervised by DHS. As with C.D's placement, execution of this portion of the Shelter Order is the functional equivalent of actions of the Court itself and thus, Defendant's actions in supervising visits between C.D. and his parents, or arranging for such supervision, are absolutely immune from damages liability. Additionally, because the Shelter Order addressed "contact" and not just visitation, any conduct by Defendant in preventing phone calls from

Plaintiffs to C.D. is absolutely immune from liability because this was also an execution of the Circuit Court's directive.

The June 10, 2010 Order retained C.D. in DHS custody but allowed Defendant to return C.D. to Currie's physical care as long as notice to the Court was provided.  It also provided that "parenting time" with the parents was at DHS's discretion.  In continuing C.D.'s placement with DeBiaso's brother until June 25, 2010, and in continuing supervised visitation until his return home, Defendant was exercising her discretion pursuant to the Circuit Court's Shelter Order. This conduct is protected by absolute immunity because making placement and supervision decisions is a quasi-judicial function.  Defendant's determinations are an extension of the authority possessed by the Circuit Court in regard to C.D.'s care and custody.  The exercise of her discretion in these matters is integrally related to the Court's authority.  As such, she is entitled to absolute immunity for the performance of these functions.  See Curry v. Castillo (In re Castillo), 297 F.3d 940, 948-49 (9th Cir. 2002) (explaining that absolute quasi-judicial immunity extends to the discretionary judgments of certain nonjudicial officers); see also Swift v. California, 384 F.3d 1184, 1188-89 (9th Cir. 2004) (explaining, in regard to parole officers, that judicial immunity extends to officials other than judges when the officials exercise discretionary judgment as part of their quasi-judicial function such as whether to grant, deny, or revoke parole, but not extending absolute immunity to parole officer actions more akin to those of law enforcement officers in issuing an arrest warrant of investigating a possible parole violation); Cordell v. Tilton, 515 F. Supp. 2d 1114, 1120 (S.D. Cal. 2007) (noting that decisions by parole officers regarding parole conditions protected by quasi-judicial absolute immunity because they are part of the granting of parole).

15 - OPINION & ORDER

Finally, assuming the truth of DeBiaso's assertions that Defendant prevented him from talking to his brother while C.D. was placed with his brother and that during the supervised visits with C.D., DeBiaso was told what to say, I need not assess whether Defendant is entitled to immunity for those actions because neither allegation supports a constitutional violation of DeBiaso's right to a familial relationship with C.D.  DeBiaso fails to show that his inability to call his brother violated his constitutional right to a familial relationship with C.D. when DeBiaso was already precluded from any unsupervised contact with C.D.  And, a conclusory assertion that he was told what to say during his supervised visits is insufficient, without more, to show that his Fourteenth Amendment rights were violated.

Defendant's motion for summary judgment on Plaintiffs' First and Second Claims for Relief is granted.  Furthermore, because I agree with Defendants as to the absolute immunity argument, I do not address Defendant's alternative qualified immunity argument.

III.  Providing False Information to the Court

In their Third Claim for Relief, Plaintiffs contend that Defendant violated their constitutional due process rights by intentionally providing false information to the Circuit Court with the expectation that the Court would rely on that false information, and that the Court did rely on that false information.  Compl. ¶ 15.

While child protective services workers enjoy the absolute quasi-prosecutorial and quasi-judicial immunities discussed above, "they are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute."  Beltran v. Santa Clara Cnty., 514 F.3d 906,

16 - OPINION & ORDER

908 (9th Cir. 2008).  Neither may they avail themselves of qualified immunity for such conduct

because the "right to be free from judicial deception in securing [an order removing a child from

the home] was clearly established" before the events at issue here.  Greene v. Camreta, 588 F.3d

1011, 1034 (9th Cir. 2009), vacated in part, 131 S. Ct. 2020 (2011).

Although absolute and qualified immunity are not available to her, Defendant contends

that Plaintiffs cannot establish that any representations she made to the Court at the shelter

hearing were false.  At issue are the following statements Defendant presented to the Court in her

June 2, 2010 Protective Custody Report:

> Three year old (C.D.) was taking [sic] into custody due to the hazardous
> conditions in his physical environment which included:  knives, chemicals, drugs
> (marijuana/prescription medication), drug paraphernalia found to be in reach of
> the child.  In additon [sic] to the above there was also concern due to the elaborate
> hydroponic marijuana grow in two of the four bedrooms.

Ex. 1 to Def. Dep. appended to Miller Decl.

Plaintiffs argue that when Defendant made these representations to the Circuit Court, she

had no idea if they were true because she had no personal information about the conditions in the

home prior to the damage done by the police.  Additionally, Plaintiffs argue, Defendant never

inquired with the police about the condition of the home prior to her arrival there.  Plaintiffs

contend that "Defendant Spitz was making up evidence when she described the conditions of the

home to the court."  Pl's Resp. to Mot. at 11.

What Plaintiffs fail to appreciate is that the statements they challenge are in response to

the question asking why C.D. was taken into protective custody.  Defendant provided a truthful

answer to that question because on June 1, 2010, C.D. was in fact taken into protective custody

as a result of the parents' arrests and because of the condition of the home which Defendant

described as she had seen it.  The fact that the police allegedly created those conditions does not make the description of the conditions as Defendant found them, false.

In deposition, Currie was asked about the factual allegations made by Defendant that Currie contended were false.  Currie Dep. (Ex. 9 to Van Meter Decl.) at 45-49.[2]  Her deposition testimony clarifies that she does not take issue with the factual representations that she permitted her child to be in a place where marijuana was manufactured and distributed, but rather her issue is with the suggestion that this put C.D. at a risk of harm.  Id.  She expressly agreed that there was one large knife on a bathroom counter and there were chemicals in the home.  Id.  She conceded there were, by police count, at least fifty pipes in the home as well as drug paraphernalia and a marijuana grow operation.  Id.  Although she stated that the chemicals, knives, and drugs were not within C.D.'s reach, she conceded that the photographs taken by the police were an accurate representation of what her home looked like and further, that if she looked at the photographs and did not know what her home looked like before the police search, a reasonable person would believe that Defendant's allegations were true.  Id.

Given the record and Currie's testimony, no reasonable juror could conclude that the statements noted above were intentionally false when Defendant made them.  These statements provide no basis for Plaintiffs' Third Claim for Relief.  Moreover, to the extent the claim is based on Defendant's alleged failure to confer with the Sheriff's Department to verify the condition of

---

    [2]  Currie appears to have been asked questions about Defendant's sworn petition filed by the Jefferson County District Attorney's Office with the Circuit Court at or before the June 2, 2010 hearing rather than the statements appearing in the June 2, 2010 Protective Custody Report she challenges in her Response Memorandum.  Compare Currie Dep. (Ex. 9 to Van Meter Decl.) at 45-49 with Pl.'s Resp. to Mot. at 10-11.  Because the statements by Defendant in the petition are virtually the same as the statements made in the Protective Custody Report, Currie's deposition testimony is relevant.

the home before making the challenged statements, such conduct at best sounds in negligence which does not support a procedural or substantive due process claim. Daniels v. Williams, 474 U.S. 327, 328, 330-31 (1986) ("The Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property"); Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care").

Plaintiffs also challenge Defendant's statement to the Court in her Protective Custody Report that "[n]o existing services could have eliminated the need for protective custody of this child because:  Child was placed in protective custody following the execution of a search warrant in which both parents were taken into custody."  Ex. 1 to Def.'s Dep. appended to Miller Decl.

Plaintiffs argue that Defendant knew this information was false when she provided it to the Court because she had been told that there were family members who could take C.D.  They also argue that Defendant knew during the June 2, 2010 hearing that Currie would be released from jail and would be home that evening and thus, the statement that there were no other alternatives was false.

Plaintiffs again fail to appreciate that the challenged statement was made in response to the question asking Defendant to describe why no existing services could have eliminated the need for protective custody.  The information Defendant provided was accurate in explaining why on June 1, 2010, there were no other services available.  DeBiaso and Currie were in fact taken into custody following their arrests after the execution of the search warrant.  Moreover, there is no dispute regarding the testimony that Defendant did not obtain information about

19 - OPINION & ORDER

DeBiaso's brother as a potential placement until later on June 1, 2010 when she spoke to DeBiaso

in jail and that because C.D. was already in protective custody at that time, any placement with a

relative had to be certified which had not yet occurred as of the time of the hearing on June 2,

2010.  Additionally, Currie testified that while she was released from jail on June 2, 2010, her

home was not ready for C.D. until the next day.  As a result, Plaintiffs fail to create an issue of

fact regarding the falsity of the challenged statement at the time Defendant made it.

Because Plaintiffs fail to establish that Defendant made a false statement to the Circuit

Court, Defendant is entitled to summary judgment on Plaintiffs' Third Claim for Relief.

CONCLUSION

Defendant's motion for summary judgment [17] is granted.

IT IS SO ORDERED.

Dated this _2nd_ day of ___JuLY_____, 2013

_Marco Hernandez_____

Marco A. Hernandez
United States District Judge

20 - OPINION & ORDER